T.C. Memo. 2009-205


UNITED STATES TAX COURT


J. MAURICE HERMAN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14005-07.                    Filed September 14, 2009.


P owned approximately 22,000 square feet (six stories) of unused development rights over a "certified historic structure" within the meaning of I.R.C. sec. 170(h)(4)(B).  In 2003 P contributed to a charitable organization a conservation easement that restricted the development of 10,000 unspecified square feet of those unused development rights.  P claimed on his tax return a deduction for the charitable contribution of a qualified conservation easement under I.R.C. sec. 170(h)(1).  R disallowed the deduction and determined a deficiency and an accompanying accuracy-related penalty under I.R.C. sec. 6662(h).  P filed a petition in this Court, and R moved for partial summary judgment on the issue of whether the contribution of the conservation easement was "exclusively for conservation purposes" with respect to the requirement that the conservation easement "preserv[e] * * * an historically important land area or a certified historic structure" within the meaning of I.R.C. sec. 170(h)(4)(A)(iv).

      <u>Held</u>:  The conservation easement does not preserve a "historically important land area" or a "certified historic structure" within the meaning of I.R.C. sec. 170(h)(4)(A)(iv).

<u>John F. Lang</u> and <u>Laura M. Vasey</u>, for petitioner.

<u>Alexandra E. Nicholaides</u>, for respondent.

MEMORANDUM OPINION

GUSTAFSON, <u>Judge</u>:  The Internal Revenue Service (IRS) determined a deficiency of $3,906,531 in petitioner J. Maurice Herman's 2003 Federal income tax and an accompanying accuracy-related penalty under section 6662(h)[1] of $1,562,612.40. Mr. Herman petitioned this Court, pursuant to section 6213(a), to redetermine this deficiency and penalty.  The case is now before the Court on respondent's motion for partial summary judgment pursuant to Rule 121.  The issue for decision is whether Mr. Herman's contribution of a conservation easement with respect to unused development rights over property held by his wholly owned New York limited liability company, Windsor Plaza, L.L.C. (Windsor), preserves a "historically important land area" or a "certified historic structure" within the meaning of section

---

[1]Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code of 1986 (26 U.S.C.) in effect for the tax year at issue, and all citations of Rules refer to the Tax Court Rules of Practice and Procedure.

170(h)(4)(A)(iv) to meet the "conservation purpose" requirement of section 170(h)(1)(C) and (h)(4). For the reasons discussed below, we will grant respondent's motion.

## Background

The following facts are not in dispute and are derived from the pleadings, the parties' motion papers, and the supporting exhibits attached thereto. At the time that he filed the petition, Mr. Herman resided in Florida.

### Title to the Fifth Avenue Property

Since 1975 Mr. Herman has owned directly or indirectly property on Fifth Avenue in New York, New York (the Fifth Avenue property). The Fifth Avenue property is improved with an eleven-story apartment building designed by the late Henry Otis Chapman in 1923 in the neo-Italianate Renaissance style of architecture. The building stands eight stories high at its front and eleven stories high at its rear, and stands within a row of taller buildings. Each building in that row stands immediately adjacent to the neighboring buildings on either side of it, and there is no undeveloped space between the building on the Fifth Avenue property and the taller buildings that abut it. These taller buildings are of approximately equal height to each other, and the building at issue is said to have the unfortunate appearance of a "chipped tooth"--first, because it is the only shorter building in the immediate vicinity, and second, because its front

section stands only eight stories high, whereas its back section stands eleven stories high.  Thus, when viewed from the street, the building's shorter front section appears to be chipped or incomplete.

On August 5, 1998, Mr. Herman transferred his rights, title, and interest in the Fifth Avenue property to Windsor, and a deed was recorded to reflect that transfer.  Less than 5 months later, on December 31, 1998, by a document entitled "Assignment", Windsor transferred, assigned, and delivered to Mr. Herman all of its rights, title, and interest in and to all of its unused development rights with respect to the Fifth Avenue property, i.e., the rights to further develop the property by, among other things, adding additional floors to the preexisting building on the property.  On the same day, by a document entitled "Agreement", Windsor agreed "along with its successors and assigns, to assist, and in no way withhold consent, the Assignee [i.e., Mr. Herman] his successors and assigns, in any manner the Assignee shall reasonably require in the development, improvement, sale, transfer, assignment or other disposition without limitation, of the aforementioned unused development rights."  Neither the Assignment nor the Agreement was recorded.

Historic Significance of the Fifth Avenue Property

The Fifth Avenue property is in the "Upper East Side Historic District", which is designated (i) a "registered

historic district" within the meaning of section 47(c)(3)(B) by the Secretary of the Interior through the National Park Service (NPS), a bureau within the U.S. Department of the Interior; and (ii) a historic district by New York City and its Landmarks Preservation Commission.

The Landmarks Preservation Commission is the local government agency charged with "the protection, preservation, enhancement, perpetuation and use of landmarks, interior landmarks, scenic landmarks and historic districts" in New York City. N.Y. City Admin. Code sec. 25-303. It is responsible for designating landmarks and historic districts and regulating changes to those landmarks and historic districts. Id. In New York City it is unlawful to alter, reconstruct, or demolish a building in a historic district, like the building on the 5th Avenue property, without the prior consent of the Landmarks Preservation Commission. Id. sec. 25-305. In determining when to grant its consent to any change to a building, the Landmarks Preservation Commission must consider the effect of the proposed change on the exterior architectural features of the building and the relationship between the results of the proposed change on the building and the exterior architectural features of other neighboring buildings in the historic district. Id. sec. 25-307.

On August 27, 2003, Mr. Herman executed a form entitled "National Park Service Historic Preservation Certification

Application Part 1 - Evaluation of Significance", requesting the NPS to certify the historic significance of the Fifth Avenue property. Mr. Herman's request was reviewed by the NPS, and it determined that the Fifth Avenue property contributes to the significance of the Upper East Side Historic District and is a "certified historic structure" within the meaning of section 170(h)(4)(B)(ii). Neither Mr. Herman's request nor the NPS's determination specifies whether the apartment building, the underlying land, or the unused development rights are to be included in or excluded from the NPS's determination. However, neither party disputes that the apartment building was included in the NPS's determination and is a "certified historic structure".

Contribution of Conservation Easement on the Fifth Avenue Property

On December 15, 2003, Mr. Herman contributed the conservation easement at issue to the National Architectural Trust, Inc. (NAT), a nonprofit section 501(c)(3) organization (currently known as the Trust for Architectural Easements) by executing a document entitled "Declaration of Restrictive Covenant" (Covenant). On December 30, 2003, the Covenant was recorded in the Office of the City Register of the City of New York. The parties to the Covenant include Mr. Herman as the "Grantor", NAT as the Donee, and Windsor as the "Confirming

Party". The term "Confirming Party" is not defined in the Covenant and has no defined meaning under New York law.

The Covenant restricts the development of 10,000 unspecified square feet of the 22,000 square feet of unused development rights[2] over the Fifth Avenue property:

> WHEREAS, on December 31, 1998, Confirming Party owned the [Fifth Avenue property]:
>
> \*       \*       \*       \*       \*       \*       \*
>
> WHEREAS, on December 31, 1998, Confirming Party transferred to Grantor all of Confirming Party's right, title and interest in and to all of Confirming Party's then unused development rights (the "Air Space") with respect to such [Fifth Avenue property];
>
> WHEREAS, Confirming Party continues to own such [Fifth Avenue property], other than the Air Space (such property other than the Air Space is the "Property");
>
> \*       \*       \*       \*       \*       \*       \*
>
> WHEREAS, the Property's conservation and preservation values will be documented in the appraisal report of Jefferson Lee Appraisals, Inc., Pittsburgh, Pennsylvania (the "Baseline Documentation"), which will be incorporated herein by reference;
>
> WHEREAS, the grant of a conservation restriction by Grantor to Donee with respect to the Restricted Air Space will assist in preserving and maintaining the Property and its architectural, historic and cultural features for the benefit of the people of the City of

---

[2]In his memorandum in support of partial summary judgment, respondent admits that "[a]ccording to the zoning regulations restricting the development of the property in 2003, there were approximately 22,000 square feet of developable air space above the Fifth Avenue property prior to the Declaration of Restrictive Covenant." (Emphasis added.) Thus, the conservation easement restricts the development of approximately 45 percent of the unused development rights.

New York, the State of New York and the United States of America;

\*          \*          \*          \*          \*          \*          \*

1.    Grantor, for the benefit of Donee (and its successors and assigns), does hereby agree that he will not build or otherwise improve 10,000 square feet of the Air Space (the "Restricted Air Space").  The restrictive covenant imposed by the Paragraph 1 is the "Restrictive Covenant."

2.    It is the purpose of the Restrictive Covenant to prevent development of the Restricted Air Space that would significantly diminish the Property's conservation and preservation values by removing the right to develop the additional housing and/or structures in the Restricted Air Space.

3.    Grantor hereby agrees with Donee (and its successors and assigns) that he will not take any action with respect to the remaining Air Space (other than the Restricted Air Space) (such remaining Air Space other than the Restricted Air Space is the "Unrestricted Air Space") that is inconsistent with the applicable restrictions, if any, imposed by the New York City Landmarks Preservation Commission.  Grantor agrees that any new construction work or rehabilitation work in the Unrestricted Air Space, whether or not Donee has given consent to undertake the same, will comply with the requirements of all applicable federal, state and local governmental law and regulations. Confirming Party agrees that any new construction or rehabilitation work on the Property, whether or not Donee has given consent to undertake the same, will comply with the requirements of all applicable federal, state and local governmental law and regulations. Grantor further agrees that, to the extent the height or density of the Unrestricted Air Space may be increased beyond that which exists as of the date of this Declaration by any action of the City of New York, such additional height and/or density shall not be utilized for any construction over and above or adjacent to the Property.

\*          \*          \*          \*          \*          \*          \*

16.  <u>Confirming Party hereby agrees with Donee (and its successors and assigns) that it will not take any action that is inconsistent with the Restrictive Covenant</u> and that, at the request of Donee, it will deliver such instruments of further assurance relating to the Restrictive Covenant as may be requested by Donee.  <u>Subject to the preceding sentence, nothing in this Declaration shall place a limit on the use of the Property</u>.  [Emphasis added.]

## Appraisal Report

Jefferson & Lee Appraisals, Inc. prepared an appraisal report for Mr. Herman that purports to calculate the diminution in value to the Fifth Avenue property resulting from the donation of the conservation easement.  The appraisal report is referred to in the eleventh "WHEREAS" clause in the Covenant, as quoted above, but the appraisal report was not recorded with the Covenant.

The appraisal report includes "[p]lans for building expansion" with respect to the apartment building on the Fifth Avenue property.  These plans project hypothetical expansions to the existing apartment building "[i]n order to take potential maximum advantage of the allowable density" both before and after the donation of the conservation easement, and they include drawings of those hypothetical expansions.  These drawings show a sixteen-story building (with sixteen stories at both the front and the rear of the building) before the donation, and a thirteen-story building (with thirteen stories at both front and rear) after the donation.  Jefferson & Lee Appraisals, Inc.,

calculated the diminution in value to the Fifth Avenue property resulting from the donation of the conservation easement to be $21,850,000.

Notice of Deficiency

Mr. Herman timely filed his 2003 Form 1040, U.S. Individual Income Tax Return, on or about April 6, 2004.  On that Form 1040, Mr. Herman claimed a deduction of $21,850,000 under section 170(a)(1) for his charitable contribution of the conservation easement to NAT.  Mr. Herman attached a Form 8283, Noncash Charitable Contributions, to the Form 1040, which showed: (i) a description of the donated property as a "Restrictive Covenant on Development Rights within National Register Historic District" with respect to the Fifth Avenue property; (ii) a stated appraised fair market value of $21,850,000 for the donated property; (iii) a declaration signed by Michael Ehrmann, an appraiser with Jefferson & Lee Appraisals, Inc., and the date of the appraisal as December 15, 2003; and (iv) an acknowledgment of receipt signed by James Kearns, president of NAT, as the donee of the conservation easement.  (However, the Form 8283 did not show all of the required information, including the date the unused development rights were acquired by Mr. Herman, how they were acquired, or Mr. Herman's adjusted basis in those rights.)  By a statutory notice of deficiency dated March 20, 2007, the IRS disallowed the charitable contribution deduction (and made other

adjustments) and determined a $3,906,531 deficiency in Mr. Herman's 2003 Federal income tax and an accompanying accuracy-related penalty under section 6662(h) of $1,562,612.40.

## Discussion

The question now before the Court is whether Mr. Herman's contribution of the easement had, as its exclusive purpose, "the preservation of an historically important land area or a certified historic structure" (emphasis added), within the meaning of section 170(h)(4)(A)(iv). Mr. Herman did not own, and did not contribute, any interest in either the existing structure at the Fifth Avenue property or the land on which it was built. The "air rights" easement that he did contribute did not oblige him to preserve--and he did not have the power to preserve--the structure of the existing building or the underlying land. Any undertaking that the structure would be preserved was made (if at all) by Windsor as the "Confirming Party" and not by Mr. Herman; and any assurance in the Covenant that the structure would be preserved was redundant of restrictions imposed by New York City's Administrative Code and the Landmarks Preservation Commission that implements those restrictions. Mr. Herman's easement did not, by its terms, specify which portion of the air space would not be developed, did not restrict him to the three-story proposal in the unrecorded appraisal report, and did not prohibit him or a subsequent bona fide purchaser from building

six stories over any half (front, back, or side) of the existing building.  Respondent contends that the conservation easement does not "preserv[e] * * * an historically important land area or a certified historic structure" within the meaning of section 170(h)(4)(A)(iv).  We agree.

I.   Standard for Summary Judgment

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials.  Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988).  The Court may grant full or partial summary judgment where there is no genuine issue of any material fact and a decision may be rendered as a matter of law.  Rule 121(b); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994).  The moving party bears the burden of showing that no genuine issue of material fact exists, and the Court will view any factual material and inferences in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Sundstrand Corp. v. Commissioner, supra at 520; Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985).  If there exists any reasonable doubt as to the facts at issue, the motion must be denied.  Sundstrand Corp. v. Commissioner, supra at 520 (citing Espinoza v. Commissioner, 78 T.C. 412, 416 (1982) ("The opposing party is to be afforded the benefit of all reasonable doubt, and

any inference to be drawn from the underlying facts contained in the record must be viewed in a light most favorable to the party opposing the motion for summary judgment")).

The issue of whether Mr. Herman's contribution of the conservation easement was "exclusively for conservation purposes" with respect to the historic preservation requirement under section 170(h)(4)(A)(iv) can be resolved on the basis of the undisputed facts.

II.  Statutory Framework

A.    Qualified Conservation Contribution

Section 170(a)(1) generally allows a deduction for any charitable contribution made during the tax year.  A charitable contribution includes a gift of property to a charitable organization, made with charitable intent and without the receipt or expectation of receipt of adequate consideration.  See Hernandez v. Commissioner, 490 U.S. 680, 690 (1989); United States v. Am. Bar Endowment, 477 U.S. 105, 116-118 (1986); see also sec. 1.170A-1(h)(1) and (2), Income Tax Regs (26 C.F.R.). While section 170(f)(3) generally does not allow an individual to deduct a charitable contribution for a gift of property consisting of less than his or her entire interest in that property, an exception applies in the case of a "qualified conservation contribution."  Section 170(h)(1) provides that a

contribution of real property is a qualified conservation

contribution if three requirements are met:

> SEC. 170(h).  Qualified Conservation
> Contribution.--
>
> (1)  In general.--For purposes of subsection
> (f)(3)(B)(iii), the term "qualified conservation
> contribution" means a contribution--
>
> (A)  of a qualified real property
> interest,
>
> (B)  to a qualified organization,
>
> (C)  exclusively for conservation
> purposes.

For purposes of this motion, respondent concedes the first two

requirements, and we therefore assume that the conservation

easement is a "qualified real property interest" and the donee is

a "qualified organization" under section 170(h)(3).  Accordingly,

we limit our consideration to the third and last requirement,

i.e., whether the contribution of the conservation easement is

"exclusively for conservation purposes."

B.    Exclusively for Conservation Purposes

A contribution is made "exclusively for conservation purposes" if it meets the tests of section 170(h)(4)[3] and (5). This requirement has two parts.

1.    Conservation Purpose

First, section 170(h)(4)(A) provides that a contribution is for conservation purposes only if it serves one of four delineated conservation purposes:

> (4)  Conservation purpose defined.--
>
> (A)  In general.--For purposes of this subsection, the term "conservation purpose" means--
>
> (i)    the preservation of land areas for outdoor recreation by, or the education of, the general public,
>
> (ii)  the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem,

---

[3]One of the principal issues in this case (i.e., whether a contribution of a restriction on "air rights" or "unused development rights" alone can preserve a "certified historic structure") will not recur for charitable contributions made after July 25, 2006.  Section 170(h)(4) was amended by the Pension Protection Act of 2006, Pub. L. 109-280, sec. 1213(a)(1), 120 Stat. 1075, which added a new subparagraph (B) to the statute.  Under section 170(h)(4)(B), a contribution is made "exclusively for conservation purposes" only if that contribution "preserves the entire exterior of the building (including the front, sides, rear, and height of the building)" and "prohibits any change in the exterior of the building which is inconsistent with the historical character of the exterior".  Therefore, a contribution of a restriction on "air rights" or "unused development rights" alone cannot preserve a "certified historic structure" under current law.

(iii) the preservation of open space (including farmland and forest land) where such preservation is--

(I) for the scenic enjoyment of the general public, or

(II) pursuant to a clearly delineated Federal, State, or local governmental conservation policy,

and will yield a significant public benefit, or

(iv) <u>the preservation of an historically important land area or a certified historic structure</u>.  [Emphasis added.]

Under the statute, each of these four prongs is a conservation purpose in and of itself, and a taxpayer's satisfaction of one of these prongs suffices to establish the requisite conservation purpose.  See S. Rept. 96-1007, at 10 (1980), 1980-2 C.B. 599, 604.  Mr. Herman contends that his contribution of the conservation easement satisfies the fourth prong, i.e., that it preserves a historically important land area or certified historic structure.

The regulations under section 170(h)(4)(A)(iv) define a "certified historic structure" as "any building, structure or land area which is":

(A)  Listed in the National Register, or

(B)  Located in a registered historic district (as defined in section 48(g)(3)(B)) and is certified by the Secretary of the Interior (pursuant to 36 CFR 67.4) to the Secretary of the Treasury as being of historic significance to the district.

A "structure" for purposes of this section means any structure, whether or not it is depreciable. Accordingly easements on private residences may qualify under this section.  In addition, a structure would be considered to be a certified historic structure if it were certified either at the time the transfer was made or at the due date (including extensions) for filing the donor's return for the taxable year in which the contribution was made.

Sec. 1.170A-14(d)(5)(iii), Income Tax Regs.

2.  <u>Perpetuity</u>

Second, section 170(h)(5)(A) provides that the "exclusively for conservation purposes" requirement will be met only if the conservation purpose is protected in perpetuity:

(5)  Exclusively for conservation purposes.-- For purposes of this subsection--

(A)  Conservation purpose must be protected.--A contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity.

Respondent has requested summary judgment only on the issue of whether the contribution of the conservation easement was "exclusively for conservation purposes" with respect to the historic preservation requirement under section 170(h)(4)(A)(iv). Accordingly, we limit our consideration to (i) whether the conservation easement preserves a "historically important land area" or a "certified historic structure" within the meaning of section 170(h)(4)(A)(iv), and (ii) whether the conservation purpose of the conservation easement, if any, is protected in perpetuity in accordance with section 170(h)(5)(A).

III. Analysis of Mr. Herman's Easement

The historic preservation requirement of section 170(h)(4)(A)(iv) is met by showing the preservation of a "historically important land area" or "certified historic structure." Mr. Herman argues in the alternative that limiting the development of the apartment building on the Fifth Avenue property preserves either (i) a "certified historic structure", i.e., the apartment building, or (ii) a "historically important land area", i.e., the underlying property. Mr. Herman also argues that even if the conservation easement does not restrict the alteration or demolition of the apartment building, a restriction on "air rights" or "unused development rights" above that building is sufficient in and of itself to preserve the apartment building or the underlying land for purposes of section 170(h)(4)(A)(iv).

A.   Preservation of a Certified Historic Structure

The apartment building on the Fifth Avenue property is a "certified historic structure" within the meaning of section 170(h)(4)(B)(ii) because it was certified as such by the Secretary of the Interior through the NPS in response to Mr. Herman's request on August 27, 2003. Therefore, if the conservation easement at issue did in fact have the purpose of preserving the apartment building as a "certified historic structure", it would have been contributed "exclusively for

conservation purposes" and Mr. Herman would be entitled to a deduction under section 170(a)(1). As a result, the determinative question is whether the conservation easement did in fact have the purpose of "preserv[ing]" the "structure" of the apartment building.

### 1. Provisions of the Easement

The conservation easement restricts the development of 10,000 unspecified square feet of Mr. Herman's unused development rights over the apartment building on the Fifth Avenue property. The Covenant, which created the conservation easement, states that the donation of 10,000 square feet of the unused development rights "will assist in preserving and maintaining the Property and its architectural, historic and cultural features for the benefit of the people of the City of New York, the State of New York and the United States of America". However, by its own terms, the Covenant merely restricts the development of 10,000 square feet of the unused development rights over the existing apartment building. It does not preclude Mr. Herman, Windsor, or subsequent purchasers of the Fifth Avenue property from altering or even demolishing that existing building.

"[A] deduction will not be allowed if the contribution would accomplish one of the enumerated conservation purposes but would permit the destruction of other significant conservation interests." Sec. 1.170A-14(e)(2), Income Tax Regs. Assuming

arguendo that limiting the development of the apartment building by 10,000 square feet does, in some way, preserve that building, the Covenant does not preclude the possibility that the building may be altered or even demolished. This allowance permits the destruction of what is clearly the most significant conservation purpose in the instant case--preserving the apartment building that was determined to be a "certified historic structure" by the NPS.

### 2. Mr. Herman's Contentions

Mr. Herman contends that this analysis is flawed, because he, Windsor, and subsequent purchasers are restricted from altering or demolishing the apartment building under the terms of the Covenant and local law. Mr. Herman points to paragraph 16 of the Covenant, where Windsor, as the Confirming Party, agreed "that it will not take any action that is inconsistent with the Restrictive Covenant". He argues that demolishing the apartment building would be inconsistent with the stated purpose of the Covenant to "assist in preserving and maintaining the Property", which includes the apartment building.

Mr. Herman further argues that the appraisal report he commissioned from Jefferson & Lee Appraisals, Inc., including an attached drawing which illustrates a hypothetical expansion of the apartment building after the donation of the conservation

easement, is incorporated in the Covenant by reference, because it was mentioned in the eleventh "WHEREAS" clause:

> WHEREAS, the Property's conservation and preservation values will be documented in the appraisal report of Jefferson Lee Appraisals, Inc., Pittsburgh, Pennsylvania (the "Baseline Documentation"), which will be incorporated herein by reference * * *.

He contends that the attached drawing illustrates the only permissible development of the apartment building after the donation of the conservation easement, and prevents him, Windsor, and subsequent purchasers from altering the building in a manner that is inconsistent with the attached drawing. Therefore, he argues, the only permissible alteration to the building would be the hypothetical expansion depicted in the drawing, i.e., to increase the height of the apartment building to thirteen stories, with the same number of stories at both the front and the rear. He correctly notes that this particular alteration would raise the apartment building's height to that of the other buildings on either side of it and heal its current "chipped tooth" appearance, arguably increasing the building's aesthetic and historical value.

However, Mr. Herman's contentions lack merit.

### a. Any Commitment To Preserve the Structure Under the Covenant Is Made by Windsor.

Paragraph 16 of the Covenant, on which Mr. Herman heavily relies, reflects undertakings by Windsor, not by Mr. Herman. Any preservation that results from Windsor's undertakings under this paragraph is not by way of a contribution from Mr. Herman and could not entitle him to the charitable contribution deduction that he claimed. Moreover, paragraph 16 merely provides that Windsor "will not take any action that is inconsistent with the Restrictive Covenant". That is, paragraph 16 arguably obliges Windsor to honor restrictions that are provided elsewhere in the Covenant and does not itself define what those restrictions are.[4]

### b. The Covenant Does Not Preserve the Structure.

The Covenant restricts only the development of 10,000 unspecified square feet of unused development rights over the apartment building. In fact, the third sentence of paragraph 16 provides that "nothing in this Declaration shall place a limit on the use of the Property." In light of that provision, even demolishing the apartment building altogether would not be inconsistent with the Covenant. Building up only the front or

---

[4]Windsor has other obligations that arguably tend in the other direction. The unrecorded "Agreement" of December 31, 1998, obliges Windsor to assist, and in no way withhold consent from, Mr. Herman and his assignees "in the development [or] improvement * * * of the aforementioned unused development rights." To the extent that unrecorded documents are consulted, this language tends against Windsor's being obliged to respect any implied restrictions on the development.

only the rear of the apartment building above the neighboring buildings would likewise be consistent with the Covenant.

It might be argued that the appearance of a structure is "preserved" in an aesthetic sense by an easement that prevents vertical development above its existing height. Assuming arguendo that there can be circumstances in which an "air rights" easement accomplishes the preservation of a "structure", Mr. Herman's easement nonetheless fails to do so.

First, if Mr. Herman were to use his retained air rights to build up a full six stories, but only on the front half of the building, he would thereby create a facade that completely filled up the visible portion of the maximum height of the building. In that circumstance, the donated air rights held by the NAT as to the back half of the building would be totally hidden behind the developed front half of the building. The donated air rights would then have no function at all in preserving even the aesthetic values associated with preventing upward development.

Second, even if the retained air rights were used only to build three full stories, leaving three full stories' worth of space empty on top of the building, the original structure would not have been "preserved" at its original height. The donated air space would hover over an altered structure, not preserving the "certified historic structure" but instead preserving an unhistorical building consisting of the historic structure plus

three newly developed stories. It could not fairly be said that the easement barring development of the top three stories somehow preserved the "certified historic structure" from which it was separated by three new stories. Moreover, the Covenant did not assure that the development would be three full stories, as we now show.

c. The Appraisal Report and the Attached Drawing Do Not Modify the Covenant To Limit the Development of the Building.

With respect to the appraisal report and the attached drawing, New York law provides that when a "contract is unambiguous on its face, there is no need to refer to its recitals, which are not part of the operative agreement". Jones Apparel Group, Inc. v. Polo Ralph Lauren Corp., 791 N.Y.S.2d 409, 410 (App. Div. 2005). Since we hold that the Covenant is unambiguous on its face--stating that it restricts the development of 10,000 unspecified square feet of unused development rights without mention of other restrictions on the development or alteration of the apartment building--there is no need to refer to the recitals, including the eleventh "WHEREAS" clause in the Covenant, which incorporates the appraisal report and the attached drawing by reference. Even assuming arguendo that the attached drawing was part of the Covenant, the drawing was (the clause says) incorporated simply to "document[]" the "conservation and preservation values" (emphasis added) of the

Fifth Avenue property--not to illustrate the only permissible development of the apartment building after the donation of the conservation easement.

Finally, even assuming arguendo that the attached drawing was part of the Covenant and was incorporated by reference to illustrate the only permissible development of the apartment building, that drawing and its mandate would not be binding on subsequent purchasers of the Fifth Avenue property because it was left unrecorded. For purposes of summary judgment, we assume that it was the intent of Mr. Herman as the owner of the retained development rights (and as the owner of Windsor, which owned the underlying building) to preserve the structure and appearance of the building and to limit development in a manner consistent with that preservation. However, the donation consisted not of Mr. Herman's intentions but of what he actually conveyed by the easement as written and recorded. To effect a contribution for a "conservation purpose * * * in perpetuity" (as required by section 170(h)(5)(A)), Mr. Herman needed to create a limitation that would survive the sale of the building and the sale of the remaining development rights to a bona fide purchaser who might not share Mr. Herman's subjective intentions. Unless that bona fide purchaser would be legally bound to the limitations depicted in the drawing, the easement failed to protect a conservation purpose in perpetuity.

Under N.Y. Real Prop. Law sec. 291-e (McKinney 2006), if an "exception, reservation or recital" refers to an unrecorded document, like the attached drawing, the reference does not affect the marketability of title or bind subsequent purchasers. See also 165 Broadway Bldg., Inc. v. City Investing Co., 120 F.2d 813 (2d Cir. 1941); L.C. Stroh & Sons, Inc. v. Batavia Homes & Dev. Corp., 234 N.Y.S.2d 401, 405 (App. Div. 1962) (New York Real Prop. Law sec. 291-e "expressly relieves a prospective purchaser from the obligation of inquiring or examining into the facts and states that an exception, reservation or recital gives no notice beyond the recital itself. In other words, it rescinds the former rule that, upon notice of a recital such as that in question, one who was interested as a potential purchaser would have been charged with any knowledge that a reasonable inquiry would have produced"). Since the attached drawing could not bind subsequent purchasers, it did not protect the conservation purpose of preserving the apartment building "in perpetuity" and fails to meet the requirement of section 170(h)(5)(A).

### d. The Protections Afforded by Local Law Will Not Support a Deduction.

Mr. Herman contends that in addition to the terms of the Covenant, we must take into account local ordinances that could prohibit the alteration or demolition of the apartment building. We disagree. The protections afforded to the building by Federal, State, or local law, whatever they may be, are not part

of the conservation easement that Mr. Herman contributed to NAT,
and he is not entitled to a deduction under section 170(a)(1) for
or because of them.  In fact, it is local law and the rules of
the Landmarks Preservation Commission that will preserve the
building.  Any right that the donee possesses under the Covenant
to sue the donor to enforce the terms of the Covenant is, by
definition, redundant of the Landmarks Preservation Commission's
role of enforcing its regulations and preventing inappropriate
alterations to the building.[5]

B.    Preservation of a Historically Important Land Area

Mr. Herman argues in the alternative that his contribution
of the conservation easement preserves the land underlying the
building, which he further contends is a historically important
land area.  The legislative history underlying section
170(h)(4)(A)(iv) describes a "historically important land area"
as one that is important in its own right or in relation to
"certified historic structures":

---

[5]As Mr. Herman's counsel explained at argument, the Covenant
"say[s] that you [the donor] must do whatever the Landmarks
Preservation Commission's rules require, and giving the NAT [the
donee] the right of enforcement."  He argued that the Landmarks
Preservation Commission is an inadequate enforcer of its own
rules and that the creation of a donee's private right to sue was
an important contribution to preservation, but this argument has
no evidentiary support in the record.  In any event, it is
difficult to justify a charitable contribution deduction for an
owner's agreement to refrain from doing what he is already
legally forbidden to do.

The term "historically important land area" is intended to include independently significant land areas (for example, a civil war battlefield) and historic sites and related land areas, the physical or environmental features of which contribute to the historic or cultural importance and continuing integrity of certified historic structures such as Mount Vernon, or historic districts, such as Waterford, Virginia, or Harper's Ferry, West Virginia.  For example, the integrity of a certified historic structure may be protected under this provision by perpetual restrictions on the development of such a related land area. * * *

S. Rept. 96-1007, supra at 12, 1980-2 C.B. at 605.  The regulations under section 170(h)(4)(A)(iv) are consistent with the legislative history and provide a nonexclusive list of three categories of "historically important land area[s]":

> (A)  An independently significant land area including any related historic resources (for example, an archaeological site or a Civil War battlefield with related monuments, bridges, cannons, or houses) that meets the National Register Criteria for Evaluation in 36 CFR 60.4 (Pub. L. 89-665, 80 Stat. 915);
>
> (B)  Any land area within a registered historic district including any buildings on the land area that can reasonably be considered as contributing to the significance of the district; and
>
> (C)  Any land area (including related historic resources) adjacent to a property listed individually in the National Register of Historic Places (but not within a registered historic district) in a case where the physical or environmental features of the land area contribute to the historic or cultural integrity of the property.

Sec. 1.170A-14(d)(5)(ii), Income Tax Regs.  Assuming arguendo that the Fifth Avenue property is a "historically important land area" within the meaning of section 170(h)(4)(A)(iv), the

undisputed facts in the record show that the conservation easement fails to preserve the underlying land.

Mr. Herman has not alleged, nor would the record support an inference, that the underlying land has independent historical significance, like a civil war battlefield.  Thus, the underlying land could be a "historically important land area" only because of its proximity and relation to the apartment building on the Fifth Avenue property, which is a "certified historic structure." See Turner v. Commissioner, 126 T.C. 299, 316 (2006); S. Rept. 96-1007, supra at 12, 1980-2 C.B. at 604.  The land's physical feature "which [contributes] to the historic or cultural importance" of the apartment building is simply its function as that building's foundation.  See S. Rept. 96-1007, supra at 12, 1980-2 C.B. at 605.  As we discussed, supra section III.A.1, the conservation easement does not prevent the alteration or demolition of the apartment building.  Therefore, it likewise does not protect the historic significance of the underlying land, which is simply to serve as the foundation of the apartment building.[6]

_____

[6]Since we conclude that the conservation easement does not protect the only possible source of historic significance of the underlying land, we need not reach the issue of whether the underlying land is a "historically important land area" within the meaning of section 170(h)(4)(A)(iv).

C.   Restriction Solely on "Air Rights" or "Unused Development Rights"

Both parties acknowledge that there is no precedent that is directly on point, and we are aware of none. However, Mr. Herman cites Dorsey v. Commissioner, T.C. Memo. 1990-242, as authority for the proposition that a conservation easement solely with respect to "air rights" or "unused development rights" may preserve a "historically important land area" or "certified historic structure."  In Dorsey, however, the taxpayers donated to a charitable organization a conservation easement over a building that included (inter alia) a facade easement and air rights.  Under the terms of the donation they (i) agreed to "'preserve and maintain the roof, * * * exterior facade(s), the foundation, and structural support of the property'" and (ii) donated "all air development rights * * * to the Property."  In Dorsey the parties had stipulated that the donation "qualifie[d] as a deductible 'qualified conservation contribution' * * *. Unresolved is the charitable contribution amount."  In valuing the conservation easement, the Court assigned a value of $30,773.52 to the restriction on the building and $122,648.92 to the restriction on the air rights.

While the Court did thus assign a value to the restriction on the air rights in Dorsey, the Court addressed only a valuation question and did not address the conservation purpose of the donation, which purpose had been stipulated.  In this case, on

the other hand, the conservation purpose is disputed and is the very issue under consideration. Dorsey is simply not on point.

We have previously held that "proximity [to a "certified historic structure"] alone does not provide a basis to support a claim of protection of a historical structure." Turner v. Commissioner, supra at 316. In Turner the taxpayers purchased 29.3 acres of unimproved land and subsequently contributed to a charitable organization a conservation easement that limited to 30 the number of residences they could construct on the land. Id. at 301-309. The unimproved land was in close proximity to Mount Vernon and other "certified historic structures", but it was not independently significant. "[D]espite any ancillary benefit of limited development", we held that the conservation easement did not preserve Mt. Vernon or other nearby "certified historic structures". Id. at 315. Despite the unimproved land's close proximity to Mount Vernon--a quintessential "certified historic structure"--we still required the taxpayer to show "how his proposed limitation in the conservation easement preserved any historical structure." Id. at 316. On the undisputed facts of this case, the restriction on the unused development rights does not preclude the demolition of the apartment building. Thus, despite the "proximity" of the unused development rights to the apartment building and the underlying land, and despite the "ancillary benefit of limited development", we hold under the

rationale of <u>Turner</u> that the conservation easement with respect to the unused development rights does not, in fact, preserve a "historically important land area" or "certified historic structure." See <u>id.</u> at 315-316. We decide only the case before us, and we therefore do not decide whether there might be some circumstances in which a restriction on "air rights" or "unused development rights" alone might preserve a "historically important land area" or "certified historic structure." On the undisputed facts before us, there is no such preservation.

Therefore, we hold that respondent has shown that he is entitled to partial summary judgment on his assertion that the contribution of the conservation easement was not "exclusively for conservation purposes" with respect to the historic preservation requirement under section 170(h)(4)(A)(iv).

To reflect the foregoing,

<u>An appropriate order will be</u>

<u>issued</u>.